[Civ. No. 4284. Second Appellate District, Division One.—January 9, 1925.]

ELIZABETH RIEDY et al., Appellants, v. GEORGE M. BIDWELL, Respondent.

CHARLES COOK, Appellant, v. GEORGE M. BIDWELL, Respondent.

[1] EXECUTORS AND ADMINISTRATORS—FINDINGS—EVIDENCE—APPEAL. In these consolidated actions to recover the amount agreed to be paid by defendant, who was the executor of a certain estate, to plaintiffs for managing and conducting a certain feed mill belonging to the estate, there was substantial evidence to support the finding of the trial court that in his individual capacity defendant did not enter into the contract with plaintiffs, but that said contract was made by defendant in his capacity as executor of said estate; and, under such circumstances, the appellate court would not interfere with such finding.

[2] ID.—CARRYING ON OF ESTATE BUSINESS — DUTY OF EXECUTOR — LIABILITY FOR LOSSES.—It is no part of the duty of an executor to carry on for the benefit of the estate a business formerly conducted by the testator in his lifetime, except where the will of the testator expressly creates the power so to do, or where the carrying on of a business would be cast upon the executor as a necessary means for the preservation of the estate; and if, in the absence of such authority, or other compelling reason, the

---

2. Individual liability of personal representative or testamentary trustee for carrying on business on behalf of estate when done under testamentary power, note, 40 L. R. A. (N. S.) 211. See, also, 11 R. C. L. 135; 11 Cal. Jur. 1027.

executor assumes to conduct the former business of the testator, it must be at his own risk as to losses incurred, but all net profits derived therefrom become the property of the estate.

[3] ID.—CONTRACTS BY EXECUTOR — PERSONAL LIABILITY. — Contracts made by an executor, even though for the benefit of the estate, if made upon a new and independent consideration as between the promisee and executor, do not bind the estate, but are binding upon the executor personally.

[4] ID.—OPERATION OF ESTATE BUSINESS BY THIRD PERSONS—DIVISION OF PROFITS—VALID CONTRACT.—The oral contract between plaintiffs and defendant, wherein the latter agreed that, if plaintiffs would manage and conduct the business of the feed mill belonging to the estate of which defendant was executor, they should receive certain stipulated salaries and, in addition thereto, the net profits over and above a certain specified percentage on the investment, to be paid to defendant, having been one under which the estate stood to receive a very considerable benefit, not only by reason of the facts that a "going concern" would be maintained and depreciation on the equipment and machinery would be lessened, but also by reason of the facts that the taxes and other upkeep expenses would be paid out of the operations of the business and the estate would receive a net profit on the investment, such contract was not illegal in itself; and the legitimacy of the contract was not militated against by the fact that through skillful guidance and management of business by plaintiffs, the result of business operations was changed from a loss to a considerable gain.

---

(1) 4 C. J., p. 878, n. 82, p. 887, n. 59.    (2) 24 C. J., p. 55, n. 48, p. 56, n. 50, p. 57, n. 58, p. 59, n. 75.    (3) 24 C. J., p. 63, n. 7. (4) 24 C. J., p. 64, n. 9, p. 970, n. 25.

APPEAL from a judgment of the Superior Court of San Diego County.  W. P. Cary, Judge.  Reversed.

The facts are stated in the opinion of the court.

L. E. Dadmun for Appellants.

Adam Thompson and Renwick Thompson for Respondent.

HOUSER, J.—On December 11, 1918, Chester Bidwell died, leaving a considerable estate. In his will he made several devises and bequests, including one to his brother George M. Bidwell, the defendant in this action, which devise and bequest consisted in certain real estate and personal property known as the San Diego Feed Mills. Defendant was also appointed executor of the will. Immediately after

the death of Chester Bidwell the feed mill was "closed down." On the first day of the following February defendant entered into an oral contract with the plaintiffs Elizabeth Riedy, Charles Cook, and E. M. Tinney (who before the death of Chester Bidwell had been in his employ) to the effect that if they would manage and conduct the business of the feed mill, each of them for such services would respectively be paid a certain stipulated salary, and, in addition thereto and as further compensation for such services, after deducting from the net profits of the business an amount equal to six per cent on the investment, to be paid to said Bidwell, the sum so remaining would be divided among said Riedy, Cook, and Tinney. Under such arrangement the feed mill was operated for a period of about thirteen months at a net profit of somewhere between about thirteen thousand dollars and approximately eighteen thousand dollars—dependent upon the testimony of which accountant the court believed was a correct statement of fact.

Defendant having failed and refused to pay to his said employees any part of the net profits earned from the operation of the feed mill, two actions for damages were brought against defendant—one by Charles Cook, and the other by Elizabeth Riedy, who sued not only on her own original cause of action against defendant, but also upon an assigned claim made to her by her co-worker, E. M. Tinney.

On the trial of the actions it was shown that, although certain profits had arisen from the operation of the business of conducting the feed mill, defendant had never accounted to the estate of Chester Bidwell therefor, but had assumed that such profits were his personal property, and, accordingly, had appropriated them to his own use.

The findings of the court included the facts "that on the 1st day of January, 1919, George M. Bidwell was not the owner, nor was he in possession for himself, or running or conducting for himself" the said feed mill; "that on the 10th day of January, 1919, and up to the 28th day of November, 1919, the said George M. Bidwell was the duly and regularly appointed, qualified and acting executor of the last will and testament of Chester Bidwell, deceased, . . . and that as said executor he was in possession for the estate of said deceased (and running said business as said executor for said estate)." The court further found that during such time plaintiffs had full knowledge of all such facts.

Judgment was rendered in favor of defendant, and the plaintiffs have appealed therefrom.

[1] Appellant's first point for reversal of the judgment is that the findings of fact are not sustained by the evidence. An examination of the record herein leads to the conclusion that there is substantial evidence upon which to base the findings to which objection is made, and the rule is so well settled as to require no citation of authority that in such circumstances, even though it may appear that the evidence preponderates to the contrary of the decision thereon as reached by the trial judge, the appellate court will not interfere. It must therefore be assumed that in his individual capacity George M. Bidwell did not enter into the contract with plaintiffs, and that such contract was made by George M. Bidwell as executor of the last will of Chester Bidwell, deceased.

[2] The law appears to be well settled that it is no part of the duty of an executor to carry on for the benefit of the estate a business formerly conducted by the testator in his lifetime. Exceptions to such rule may exist where the will of the testator expressly creates the power so to do, or where the carrying on of a business would be cast upon the executor as a necessary means for the preservation of the estate. If in the absence of such authority, or other compelling reason, the executor assumes to conduct the former business of the testator, it must be at his own risk as to losses incurred, but all net profits derived therefrom become the property of the estate. (*In re Rose,* 80 Cal. 166 [22 Pac. 86]; *Estate of Broome,* 162 Cal. 258 [122 Pac. 470]; *Estate of Smith,* 118 Cal. 462 [50 Pac. 701]; *Brenham* v. *Story,* 39 Cal. 179; *Estate of Freud,* 131 Cal. 667 [82 Am. St. Rep. 407, 63 Pac. 1080]; *Estate of De Rome,* 175 Cal. 399 [165 Pac. 919].)

In the case entitled *In re Rose,* 80 Cal. 166, at page 173 [22 Pac. 86], it is said: "If, as in this case, the administrator elects to assume the peril, and is permitted by the court and parties interested, without objection, to so conduct and manage the business, the liabilities growing out of the management are not claims which could be enforced against the estate by the holders thereof. They are his liabilities. He has a right to pay them out of the increase of the business, but if by so doing a loss is sustained to the estate, he must make the loss good. Protected from loss and from

liability at all times, the estate is interested in the business only to the extent of its profits; and in them, not because it is the business of the estate, but because the administrator is using the property of the estate in a way he is not authorized to do, and, consequently, is required to account for all the profit made by its use."

[3] It is likewise a general rule, supported by a host of authorities, that contracts made by an executor, even though for the benefit of the estate, if made upon a new and independent consideration as between the promisee and executor, do not bind the estate, but are binding upon the executor personally. (24 Cor. Jur., sec. 483, and cases there cited; also 11 Cal. Jur., sec. 673.)

In the early case of *Dwinelle* v. *Henriquez*, 1 Cal. 388, it was held that a public administrator was personally liable for the services of an attorney, performed by him at the request of the public administrator and in the interests of the particular estate involved. Although the point is not necessary to the decision, the same principle is indicated in the case of *Gurnee* v. *Maloney*, 38 Cal. 85 [99 Am. Dec. 352].

In *Estate of Page*, 57 Cal. 238, it appears that an administrator had made a contract with an attorney to give him an interest in certain property of the estate contingent upon recovery thereof. The court held that it was not within the power of the administrator to bind the estate by such a contract, but that "the administrator *might be* personally liable."

The case of *Briggs* v. *Breen*, 123 Cal. 657 [56 Pac. 633, 886], was another case where it was held that executors were personally liable for attorneys' fees. Touching the point, the court said: "Since there was no agreement that the attorneys should look for their fees to the estate or an allowance therefrom by the court, it follows that the executors were liable personally to them for their reasonable compensation; it was so decided in *Dwinelle* v. *Henriquez*, 1 Cal. 387, and has been more or less distinctly asserted in several cases since (citing cases)."

In the case of *Maxon* v. *Jones*, 128 Cal. 77 [60 Pac. 516], the administrator of the estate entered into a contract by which he authorized a broker to procure a loan for and on behalf of the estate, and agreed to pay to the broker a commission of fifteen hundred dollars for his services in obtain-

ing the loan. It was held that the administrator was personally liable. In the course of the opinion it is said: "We understand the well-settled rule to be that the administrator or executor of an estate is personally liable on his contract for services rendered the estate unless there is an agreement to the contrary."

In the case of *Moffitt* v. *Rosencrans,* 136 Cal. 416 [69 Pac. 87], an executrix, who was sole residuary legatee under the will, without any order of court, had made a contract to sell certain land and had given possession thereof to the vendee. Suit was afterward brought by the executrix to recover possession of the land, and it was held that, in view of the fact that she was the sole residuary legatee of the estate, and that at the time of her agreement to sell the land the time for claims against the estate had expired and all debts and legacies had been paid, leaving in her hands more than sufficient money to close the administration, she had thus become the sole beneficial owner of the land; and that the contract of sale was binding on her personally.

In *Melone* v. *Ruffino,* 129 Cal. 514 [79 Am. St. Rep. 127, 62 Pac. 93], it is held (syllabus): "There is nothing unlawful in an administrator binding himself personally by a contract to sell the property of the estate in good faith for the benefit of himself and other heirs; and though he may not be able to make a title by the decree of the courts within the time limited, he may bind himself personally by a valid agreement for the return of the deposit made by his authority."

See, also, *McKee* v. *Hunt,* 142 Cal. 526 [77 Pac. 1103]; *Estate of Kruger,* 143 Cal. 141 [76 Pac. 891]; *Golden Gate Undertaking Co.* v. *Taylor,* 168 Cal. 94 [Ann. Cas. 1915D, 742, 52 L. R. A. (N. S.) 1152, 141 Pac. 922]; *Estate of Kasson,* 119 Cal. 489 [51 Pac. 706]; *Sterrett* v. *Barker,* 119 Cal. 494 [51 Pac. 695].

The only case which in any manner militates against the principle of law expressed in the foregoing cases to which attention of the court has been directed is that of *Danielwitz* v. *Sheppard,* 62 Cal. 339, in which it appeared that an administratrix, under an order of court, sold certain real property belonging to the estate for a specified sum of money and reported the sale to the court for confirmation, pending which proceedings the administratrix, joining with an heir

of the deceased, made an agreement with a broker to the effect that whatever sum he might be able to procure to be bid for said property on the hearing of the petition for confirmation of the sale which would be over and above the amount already bid thereon should be paid to such broker as his commission for affecting such sale at a higher price. The sale was made at an advanced price, and the administratrix and the heir declined to comply with the terms of the agreement. An action was brought against them on the contract. The trial court found that the contract was executed by the defendants as heirs of the estate and not in any representative capacity, and that it was so understood and agreed at the time of its execution. The court held that the contract was illegal and contrary to the policy of the law and that there could be no recovery thereon.

A somewhat similar case in principle is that to be found in *Estate of Willard,* 139 Cal. 501 [64 L. R. A. 554, 73 Pac. 240], wherein it appears that the property was sold at public auction (subject to confirmation by the court) for the sum of fifteen thousand five hundred dollars. After the public sale of the property the administrator of the estate made an agreement with the broker to the effect that, so far as he had the power or was able, he would pay to the broker the sum of fourteen hundred dollars, provided that at the time set for the confirmation by the court of the sale of the property, the broker would procure a bid of twenty thousand dollars therefor; and thereupon that the administrator would ask the judge of the probate court, in fairness to the broker, to order payment to the broker of said sum of fourteen hundred dollars. It was held that while the administrator had no power to make a contract for services which would bind the court in the settlement of his final account, the court had authority to make an allowance to the administrator for a reasonable compensation to the broker who had rendered valuable services affecting the sale of real estate at a largely increased bid whereby a profit accrued to the estate.

In the case of *Hickman-Coleman Co.* v. *Leggett,* 10 Cal. App. 29 [100 Pac. 1072], an action was brought against the defendant individually for services rendered to the defendant by the plaintiff in procuring a purchaser for real estate belonging to the estate wherein the defendant was the sole

executor of the will of the deceased. In the course of the opinion it is said: ''It is well settled that an executor or administrator cannot create any liability against the estate in his charge by his employment of attorneys, brokers or others to assist him in the performance of his duties. The attorney, broker or other person employed has no action or claim against the estate. Whatever claim he has, whether it be absolute or conditional, is against the executor or administrator in his individual capacity, who in turn may, if the expenditure was made in good faith and was proper, be credited therewith in the settlement of his accounts with the estate (citing cases).'' The appeal was from a judgment entered against the plaintiff upon an order sustaining the defendant's demurrer to the complaint. The court held that the plaintiff having fully performed its contract was entitled to its commissions, and reversed the judgment.

With reference to the contract in the case of *Danielwitz v. Sheppard*, 62 Cal. 339, to which attention has heretofore been directed, it appears that the purpose of the agreement between the parties was not to benefit the estate, but was solely to advantage the person with whom the contract was made. No part of the increase in price to be paid for the property to be sold was to inure to the benefit of the estate, but the whole thereof was to be paid to the broker, who was to induce someone to make a bid higher than the bid already received by the administratrix. Without the intervention of the broker it is possible that the identical person who offered the increase in price for the property might have offered a higher price, and thus enriched the estate. But by the contract entered into between the administratrix and the broker there was no possibility of procuring a better price for the property, so far as the estate was concerned, from any person who might be induced to bid therefor by or through the efforts of the broker.

[4] By virtue of the carrying out of the terms of the contract in the instant case the estate stood to receive a very considerable benefit: first, in the fact that the business would be more presentable to any intending or prospective purchaser as a ''going concern,'' and hence more salable and at a higher price than though it were ''closed down''; secondly, as a ''going concern'' and by reason of its reasonable use the various machinery, equipment, and property gener-

ally would not deteriorate and therefore depreciate in value to the same extent as though standing idle; and, thirdly, there was a possibility not only of having the taxes and general upkeep bills paid by reason of the operation of the business, but as well a net profit to the estate of six per cent on the investment. The contract was not illegal in itself. Having been made by the executor presumably for the purpose of preserving the property of the estate, as well as with the expectation of earning a profit therefrom, it would have been within the power of the court to make allowance to the executor in his account for his proper and necessary expenses in connection therewith. (*In re Rose*, 80 Cal. 166 [22 Pac. 86].) Had there been no net profit over and above the stipulated fixed salaries of the respective employees, or had the net profit, as estimated solely by dollars and cents, been nominal in amount, no good reason would appear why in effect the contract should not have been recognized and ratified. That under the apparently skillful guidance and management of the plaintiffs the result of business operations was changed from a loss to a considerable gain should in no way militate against the legitimacy of the contract. The plaintiffs in all good faith performed their part of the agreement. It is but right and just that the defendants should be compelled to compensate the plaintiffs in accordance with the terms of the agreement.

The judgment is reversed.

Conrey, P. J., and Curtis, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on March 9, 1925.

All the Justices concurred.